**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

REBECCA LESCHINSKI,
Personal Representative of the Estate of
JOSEPH LESCHINSKI, Deceased,

    Plaintiff,

v.

TOWNSHIP OF CANTON, OFFICER
BRANDON HAYFORD, OFFICER ALEXIS
DIVETTA, WAYNE COUNTY, DEPUTY
CHRISTOPHER PAULSEN, CORPORAL ERIC
ROBINSON, DEPUTY TAMIKO BALL,
DEPUTY KURT MCLEOD, DEPUTY JASON
THOMAS, DEPUTY CARL MILLER-REYNA,
CORPORAL DANIEL BUDIMIR, SERGEANT
DONALD WATTS, DEPUTY KHIDAIR AL-
ABID, DEPUTY BENJAMIN LECK,
WELLPATH, LLC, JOHN DOE PSYCHIATRIST,
TIMOTHY HAYES, NP, CLARISSE CARTER,
NP, JESSICA CANDACE-EBONY DAVIS,
LLPC, LILIAN EKECHUKWU, RN, ANGELA R.
LATHAM, RN,

    Defendants.

Case No.  2:24-cv-10012

HON.

---

JAMES J. HARRINGTON, IV (P65351)
KEVIN C. RIDDLE (P57435)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West 10 Mile Road
Southfield, MI  48075
(248) 355-5555 / (248) 355-5148 - fax
k.riddle@fiegerlaw.com

---

{01552689.DOCX}

## PLAINTIFF'S COMPLAINT, AFFIDAVITS OF MERIT AND DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, REBECCA LESCHINSKI, Personal Representative of the Estate of JOSEPH LESCHINSKI, Deceased, by and through her attorneys, Fieger, Fieger, Kenney & Harrington, P.C., and for her Complaint against Defendants, states as follows:

### JURISDICTION AND VENUE

1.      That this Court has jurisdiction of this action under the provisions of Title 28 of the United States Code, Sections 1331, 1343, and 42 USC §1983 and also has pendent jurisdiction over all state claims that arise out of the nucleus of operative facts common to Plaintiff's federal claims.

2.      This is a civil action brought pursuant to the Civil Rights Act, 42 U.S.C. §1981, *et seq*., seeking monetary and punitive damages against Defendants under 42 U.S.C. §1983, and costs and attorney fees under 42 U.S.C. §1988, for violations of Plaintiff's rights under the Fourth and/or Fourteenth Amendments of the United States Constitution.

3.      That Plaintiff brings this suit against each and every Defendant in both their individual and official capacities.

4.      That each and every act of Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws and customs, and by virtue of, and under the authority of the

color of law and such actions were performed in the course and scope of employment of each individual Defendant.

5.     That the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorney fees.

## **GENERAL ALLEGATIONS**

6.     Plaintiff hereby restates and re-alleges the above paragraphs as if fully stated herein.

7.     Plaintiff, REBECCA LESCHINSKI, has been appointed the Personal Representative of the Estate of JOSEPH LESCHINSKI, Deceased (hereinafter "Leschinski" or "Decedent") by the Wayne County Probate Court.  She is the widow of the decedent.

8.     JOSEPH LESCHINSKI was a resident of the Township of Canton, County of Wayne, State of Michigan, and was entitled to all the rights, privileges, and immunities accorded to all U.S. citizens and residents of Wayne County, the State of Michigan and the United States of America and was at all relevant times a Pre Trial Detainee.

9.     At all times relevant, Plaintiff REBECCA LESCHINSKI was and is a resident of the Township of Canton, County of Wayne, State of Michigan.

10. At all times relevant, Defendant, TOWNSHIP OF CANTON, is a municipal corporation and governmental subdivision organized and existing under the laws of the State of Michigan.

11. At all times relevant, Defendant, OFFICER BRANDON HAYFORD, was acting under color of law and in the course and scope of his employment as a police officer, employed by the Canton Police Department. He is named in this action in his official and individual capacity.  He is a resident of the state of Michigan.

12. At all times relevant, Defendant, OFFICER ALEXIS DIVETTA, was acting under color of law and in the course and scope of her employment as a police officer, employed by the Canton Police Department. She is named in this action in her official and individual capacity.  She is a resident of the state of Michigan.

13. Defendants, OFFICER BRANDON HAYFORD and OFFICER ALEXIS DIVETTA hereinafter are collectively referred to as "CANTON POLICE OFFICERS".

14. At all times relevant, Defendant, WAYNE COUNTY, is a municipal corporation and governmental subdivision organized and existing under the laws of the State of Michigan.

{01552689.DOCX}                                   4

15.     Defendant, DEPUTY CHRISTOPHER PAULSEN, is a Wayne County Sheriff's Department Corrections Deputy, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, DEPUTY CHRISTOPHER PAULSEN, was acting under color of law and was acting in the course and scope of his employment with Wayne County.  He is named in his individual and official capacity.  He is a resident of the State of Michigan.

16.     Defendant, CORPORAL ERIC ROBINSON, is a Wayne County Sheriff's Department Corrections Corporal, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, CORPORAL ERIC ROBINSON, was acting under color of law and was acting in the course and scope of his employment with Wayne County. He is named in his individual and official capacity.  He is a resident of the State of Michigan.

17.     Defendant, DEPUTY TAMIKO BALL, is a Wayne County Sheriff's Department Corrections Deputy, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, DEPUTY TAMIKO BALL, was acting under color of law and was acting in the course and scope of her employment with Wayne County.  She is

named in her individual and official capacity.  She is a resident of the State of Michigan.

18.     Defendant, DEPUTY KURT MCLEOD, is a Wayne County Sheriff's Department Corrections Deputy, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, DEPUTY KURT MCLEOD, was acting under color of law and was acting in the course and scope of his employment with Wayne County.  He is named in his individual and official capacity.  He is a resident of the State of Michigan.

19.     Defendant, DEPUTY JASON THOMAS, is a Wayne County Sheriff's Department Corrections Deputy, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, DEPUTY JASON THOMAS, was acting under color of law and was acting in the course and scope of his employment with Wayne County. He is named in his individual and official capacity.  He is a resident of the State of Michigan.

20.     Defendant, DEPUTY CARL MILLER-REYNA, is a Wayne County Sheriff's Department Corrections Deputy, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, DEPUTY CARL MILLER-REYNA, was acting under color of

law and was acting in the course and scope of his employment with Wayne County.  He is named in his individual and official capacity.  He is a resident of the State of Michigan.

21.    Defendant, CORPORAL DANIEL BUDIMIR, is a Wayne County Sheriff's Department Corrections Corporal, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, CORPORAL DANIEL BUDIMIR, was acting under color of law and was acting in the course and scope of his employment with Wayne County.  He is named in his individual and official capacity.  He is a resident of the State of Michigan.

22.    Defendant, SERGEANT DONALD WATTS, is a Wayne County Sheriff's Department Corrections Sergeant, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, SERGEANT DONALD WATTS, was acting under color of law and was acting in the course and scope of his employment with Wayne County. He is named in his individual and official capacity.  He is a resident of the State of Michigan.

23.    Defendant, DEPUTY KHIDAIR AL-ABID, is a Wayne County Sheriff's Department Corrections Deputy, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this

action, Defendant, DEPUTY KHIDAIR AL-ABID, was acting under color of law and was acting in the course and scope of his employment with Wayne County. He is named in his individual and official capacity.  He is a resident of the State of Michigan.

24.    Defendant, DEPUTY BENJAMIN LECK, is a Wayne County Sheriff's Department Corrections Deputy, and at all times relevant to this action was assigned to the Wayne County Jail, Division 1.  At all times relevant in this action, Defendant, DEPUTY BENJAMIN LECK, was acting under color of law and was acting in the course and scope of his employment with Wayne County. He is named in his individual and official capacity.  He is a resident of the State of Michigan.

25.    Defendants, DEPUTY CHRISTOPHER PAULSEN, CORPORAL ERIC ROBINSON, DEPUTY TAMIKO BALL, DEPUTY KURT MCLEOD, DEPUTY JASON THOMAS, DEPUTY CARL MILLER-REYNA, CORPORAL DANIEL BUDIMIR, SERGEANT DONALD WATTS, DEPUTY KHIDAIR AL-ABID and DEPUTY BENJAMIN LECK, hereinafter are collectively referred to as "CORRECTIONS OFFICERS".

26.    At all times relevant, Defendant, WELLPATH, LLC, is a foreign limited liability company, licensed and conducting regular business in the State of

Michigan. Defendant, WELLPATH, LLC'S resident agent is Corporate Creations Network Inc., located at 28175 Haggerty Road, Novi, MI 48377.

27. At all times relevant, Defendant, WELLPATH, LLC, provided mental health services to the Wayne County Jail under a "Jail Services Agreement" and/or contract for mental health services with WAYNE COUNTY and therefore at all times relevant was acting under color of law.

28. At all times relevant, Defendant, JOHN DOE PSYCHIATRIST, is a physician licensed to practice medicine in the State of Michigan and was employed by and/or contracted with WELLPATH, LLC and/or WAYNE COUNTY, as the on-staff psychiatrist at the Wayne County Jail. Defendant, JOHN DOE PSYCHIATRIST was acting in the course and scope of his employment at all relevant times and was acting under color of law.

29. At all relevant times, TIMOTHY HAYES, NP, is a nurse practitioner, licensed in the State of Michigan and was employed by WELLPATH, LLC to provide mental health services at the Wayne County Jail. Defendant, TIMOTHY HAYES, NP, was acting in the course and scope of his employment at all relevant times and was acting under color of law.

30. At all relevant times, CLARISSE CARTER, NP, is a nurse practitioner, licensed in the State of Michigan and was employed by WELLPATH, LLC to provide mental health services at the Wayne County Jail. Defendant,

CLARISSE CARTER, NP, was acting in the course and scope of her employment at all relevant times and was acting under color of law.

31. At all relevant times, JESSICA CANDACE-EBONY DAVIS, LLPC, is a Limited Licensed Counselor, licensed in the State of Michigan and was employed by WELLPATH, LLC to provide mental health services at the Wayne County Jail. Defendant, JESSICA CANDACE-EBONY DAVIS, LLPC, was acting in the course and scope of her employment at all relevant times and was acting under color of law.

32. At all relevant times, LILIAN EKECHUKWU, RN, is a Registered Nurse, licensed in the State of Michigan and was employed by WELLPATH, LLC to provide nursing services at the Wayne County Jail. Defendant, LILIAN EKECHUKWU, RN, was acting in the course and scope of her employment at all relevant times and was acting under color of law.

33. At all relevant times, ANGELA R. LATHAM, RN, is a Registered Nurse, licensed in the State of Michigan and was employed by WELLPATH, LLC to provide nursing services at the Wayne County Jail. Defendant, ANGELA R. LATHAM, RN, was acting in the course and scope of her employment at all relevant times and was acting under color of law.

34. Defendants, JOHN DOE PSYCHIATRIST, TIMOTHY HAYES, NP, CLARISSE CARTER, NP, JESSICA CANDACE-EBONY DAVIS, LLPC,

LILIAN EKECHUKWU, RN and ANGELA R. LATHAM, RN, hereinafter are collectively referred to as "WELLPATH MEDICAL STAFF".

## PRELIMINARY FACTUAL STATEMENT

35.    Delerium tremens "is a life-threatening condition caused by acute alcohol withdrawal." *Greene v Crawford County*, 22 F.4th 592, 599 (2002).

36.    A person experiencing *delirium tremens* will typically show agitation, hallucinations, and disorientation.  *Delerium tremens* occurs in roughly 5% of patients undergoing alcohol withdrawal and "usually appears 2 to 4 days after the patient's last us of alcohol." *Id.*

37.    Roughly "1 to 4% of hospitalized patients with [*delirium tremens*] die," but "this rate could be reduced if an appropriate and timely diagnosis were made and symptoms were adequately treated." Id; *citing* Marc Schuckit, *Recognition and Management of Withdrawal Delerium (Delerium Tremens)*, 371 New Eng. J. Med.

38.    Treatment for *delirium tremens* is best "carried out in a locked inpatient ward or an ICU." *Greene, supra*, at 599.

39.    The "best approach to the management of [*delirium tremens*] includes a careful physical examination and appropriate blood tests to identify and treat medical problems that may have contributed to the severe withdrawal state. *Id.*

40.     Treatment should include providing "supportive care by monitoring vital signs frequently (every 15-30 minutes) in a quiet, well-lit room, reorienting patient to time, place, and person and providing medications to control agitation, promote sleep, and raise the seizure threshold. *Id.*

41.     It was a clearly established right in this circuit at the time of the incident that a prisoner has a right not to have his known, serious medical needs disregarded by a medical provider or an officer.

42.     It was well established in the circuit at the time of the incident that *delirium tremens* was an objectively serious medical need.

**FACTUAL ALLEGATIONS**

43.     Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

44.     That on or about August 4, 2021, at around 10:24 AM, TOWNSHIP OF CANTON police officers, Defendants, OFFICER BRANDON HAYFORD and OFFICER ALEXIS DIVETTA, responded to a domestic violence call made by Rebecca Leschinski at 5926 Sandhurst Apt. #204, Canton, MI.

45.     That Rebecca Leschinski informed Defendant OFFICER DIVETTA that LESCHINSKI drank alcohol daily and had been drinking alcohol between 7:00AM and 9:00 AM that morning.

46.     From the description provided by Rebecca Leschinski, OFFICER DIVETTA should have understood that JOSEPH LESCHINSKI was an alcoholic.

47.     That at said date, time and place, JOSEPH LESCHINSKI, was not present when the officers arrived, but returned to the residence upon OFFICER BRANDON HAYFORD's request.

48.     That when LESCHINSKI arrived at approximately 11:00 AM, he admitted to consuming alcohol that morning.  LESCHINSKI was observed to have blood shot and glossy eyes, and a difficult time focusing his eyes when engaging in conversation.  LESCHINSKI had extreme difficulty focusing his attention when speaking.  LESCHINSKI frequently needed to lean against his vehicle to maintain his balance while speaking.

49.     That OFFICER DIVETTA conducted several standardized field sobriety tests with LESCHINSKI which he was unable to satisfactorily perform. LESCHINSKI registered a .35 blood alcohol concentration (BAC) when administered his first preliminary breath test (PBT).  LESCHINSKI stated that he drank one double shot of liquor that morning.

50.     That at approximately 1100 hours, LESCHINSKI was taken into custody by CITY OF CANTON under suspicion of domestic violence and operating while intoxicated.

51.    That Rebecca Leschinski informed TOWNSHIP OF CANTON OFFICERS that LESCHINSKI drinks daily.

52.    That Defendants, TOWNSHIP OF CANTON OFFICERS should have understood from his observations and Rebecca Leschinski's description that JOSEPH LESCHINSKI was an alcoholic.

53.    That TOWNSHIP OF CANTON conducted a second PBT on LESCHINSKI at 12:04 PM, resulting in .30 BAC. A third PBT was administered at 12:07 PM resulting in .31 BAC.

54.    Upon information and belief, Canton Township Fire Department transported LESCHINSKI from the Canton Jail to St. Mary's Hospital on August 4, 2021, at 12:36 PM, due to being "extremely intoxicated."   LESCHINSKI reported to EMS he had 3 shots this morning, as well as 2 beers and 2 shots the night before.  LESCHINSKI further reported using marijuana earlier that morning and that he currently felt agitated and dizzy.  Defendant OFFICERS HAYFORD and DIVETTA followed LESCHINSKI to St. Mary's.

55.    That at St. Mary's, LESCHINSKI's chief complaint was documented as "alcohol intoxication."  On evaluation, LESCHINSKI reported to St. Mary's ER physician, Dr. Shirley Meyer, that he drank several "Long Island iced teas" the night before and had a "double-shot" that morning.  LESCHINSKI further reported in the ER that he had felt "shaky" on occasion when he stopped drinking.

{01552689.DOCX}                    14

56. That LESCHINSKI was discharged by Dr. Meyer who reported, "He is intoxicated with alcohol. I discussed this with the police deputy who stated to me that the patient will remain in police custody until tomorrow morning when he is arraigned. Given that he will be monitored in police custody throughout the course of the day and evening, I feel it is safe for him to be discharged back to the jail, as he will be in a monitored setting. 'Strict return precautions' were reviewed with the police officer accompanying Mr. Leschinski at the hospital. Instructions included to call 911 if 'You feel confused.'"

57. The officer who was provided with "strict return precautions" was either OFFICER DIVETTA and/or OFFICER HAYFORD.

58. Upon information and belief, LESCHINSKI returned to the TOWNSHIP OF CANTON at approximately 2:00 PM on August 4, where he was lodged until August 6, 2021. Defendant, OFFICER DIVETTA, reportedly contacted *Growth Works* to have a peer recovery coach meet with LESCHINSKI while he was in custody.

59. That no treatment to prevent alcohol withdrawal and/or onset of *delirium tremens* was provided to LESCHINSKI by the TOWNSHIP OF CANTON, nor was he seen by medical providers at TOWNSHIP OF CANTON for treatment and/or prevention of alcohol withdrawal.

60.     Upon information and belief, there was a practice at the TOWNSHIP OF CANTON not to provide medical treatment at the jail for alcohol withdrawal and the prevention of *delirium tremens*.

61.     That on August 6, 2021, LESCHINSKI received a personal bond with an alcohol tether requirement ordered by Judge Michael J. Gerou, 35th District Court.  LESCHINSKI was transferred to Wayne County Jail later that day, pending enrollment into the tether program.

62.     Upon information and belief, LESCHINSKI was transferred to Andrew C. Baird Detention Facility, Jail Division 1, on or about August 6, 2021 at around 7:08 PM.

63.     Upon information and belief, the "strict return precautions" provided to OFFICER DIVETTA and/or OFFICER HAYFORD were not forwarded to the Andrew C. Baird Detention Facility, Jail Division 1.

64.     At the time of transfer, LESCHINSKI had been two days without alcohol nor any sort of alcohol withdrawal treatment and/or prevention.

65.     The "strict precautions" were provided because Leschinski had a substantial risk of substantial harm from severe alcohol withdrawal and/or *delirium tremens*.

66.     It was obvious to a lay person based on the knowledge of DIVETTA and HAYFORD of LESCHINSKI'S blood alcohol, the reporting of his daily

drinking habits and the doctor's "strict instructions" that LESCHINSKI was at substantial risk of *delirium tremens* if he was not provided with a detoxification protocol.

67.   It was obvious based on the history, the personal interactions with Leschinski and the "strict precautions" provided that Leschinski was at substantial risk of substantial harm if those "strict precautions" were not followed.

68.   That the Andrew C. Baird Detention Facility, Jail Division 1, houses inmates who are clinically assessed as needing residential (daily) mental health services in addition to psychotropic medications. Inmates who are classified as requiring exceptionally close monitoring and segregation from the general population are housed in Jail Division 1.

69.   Upon information and belief, LESCHINSKI was booked at the Wayne County Jail at 8:40 PM by Defendant, DEPUTY CHRISTOPHER PAULSEN. DEPUTY PAULSEN transferred LESCHINSKI into "X Mode (pending housing in transit), pending his receiving screening by Wellpath." LESCHINSKI'S intake medical screening was not conducted until approximately 8 hours later at 5:01 AM on August 7th.

70.   That on August 7, 2021, at approximately 5:01 AM, Defendant, LILLIAN   EKECHUKWU,   RN,   conducted   LESCHINSKI'S   "Receiving Screening."  LESCHINSKI reported to Nurse EKECHUKWU that he consumes

alcohol, specifically vodka, on a daily basis. LESCHINSKI reported to Nurse EKECHUKWU that he consumes approximately six shots per day and that he has been using alcohol at this rate for more than one year. His reported last date of use was 8/5/2021.Nurse EKECHUKWU electronically signed the Receiving Screening at 5:05 AM on August 7, 2021.

71. That LESCHINSKI'S self-reporting should have indicated to Defendant, LILLIAN EKECHUKWU, RN, that he was at substantial risk of having a serious medical need – namely severe alcohol withdrawal resulting in *delirium tremens*.

72. Clinical Institute of Withdrawal Assessment (CIWA) is the most extensively studied scale for quantifying the alcohol withdrawal syndrome. Quantification is key to preventing excess morbidity and mortality in patients who are at risk for alcohol withdrawal. CIWA helps clinical personnel recognize the process of withdrawal before it progresses to more advanced stages, such as *Delirium Tremens.* CIWA-Ar scale measures 10 symptoms and requires two minutes to perform.

73. That Defendant, EKECHUKWU, RN's documented final disposition for LESCHINSKI indicated that no CIWA monitoring was performed. She recommended placement in *general population*.

74. That Defendant, EKECHUKWU, RN stated to investigators that Wellpath administration wants anyone who is on alcohol to be placed on CIWA; however, LESCHINSKI was not.

75. That Defendant, EKECHUKWU, RN was aware that LESCHINSKI would be released only on an alcohol tether when his bond was paid.

76. That the detox protocol is referred to as CIWA at the jail, according to EKECHUKWU, RN'S statement provided to the Wayne County Sheriff.

77. That Defendant, EKECHUKWU, RN, indicated in a statement to the Wayne County Sheriff that the CIWA protocol would have included a combination of electrolytes, meclizine medication to control diarrhea, Tylenol, and something to help the individual sleep/relax. LESCHINSKI was denied these important interventions to minimize the effects of alcohol withdrawal and to prevent *delirium tremens*.

78. That Defendant, EKECHUKWU, RN stated to investigators that she did not place LESCHINSKI on CIWA protocol because, "With withdrawals, the greatest time to withdraw is the first three days."

79. Defendant EKECHUKWU, RN stated to investigators that she was taking LESCHINSKI'S vitals on the third day. EKECHUKWU, RN stated that based on the third day vitals, his blood sugar, and the unsupported belief that his

wife was coming to get him the next day, she felt like there was no need to put him on CIWA protocol.

80.    EKECHUKWU, R.N. chose not to place LESCHINSKI in detoxification protocol in spite of the fact that delirium tremens occurs in roughly 5% of patients undergoing alcohol withdrawal and usually appears 2 to 4 days after the patient's last use of alcohol.

81.    Defendant EKECHUKWU, RN should have known that LESCHINSKI was at substantial risk of substantial harm by not receiving detoxification treatment to prevent *delirium tremens*.

82.    That the *"Wayne County Jail Classification Questionnaire"* was never completed for LESCHINSKI.  A copy of the blank form with his name on it was produced pursuant to FOIA, with a note, "Unable to interview."  Questions included: "Do you have a history of using DRUGS/ALCOHOL? If so, what and how often?"

83.    No CIWA score was recorded for LESCHINSKI who was arrested for OWI with a BAC of .35 at 10:24 AM, and who was taken to the hospital by ambulance for severe alcohol intoxication just two days prior, and was a daily drinker and alcoholic.

84.    That on August 8, 2021, at approximately 7:00 AM, Defendant, CORPORAL ERIC ROBINSON, reported to Defendant, DEPUTY TAMIKO

BALL, during their shift change, that LESCHINSKI had been up all night yelling and keeping other inmates awake. Neither ROBINSON nor BALL reported this behavior to medical.

85.   Neither CORPORAL ERIC ROBINSON nor DEPUTY TAMIKO BALL contacted medical nor call 911 in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

86.   It should have been obvious based on medical intake and actual observations combined with the knowledge that LESCHINSKI was not in detoxification protocol that he had a substantial risk of substantial harm requiring urgent medical attention.

87.   That DEPUTY BALL observed that LESCHINSKI was louder than a normal inmate at the 0700 hour.  During DEPUTY BALL'S 0800 hour round check, LESCHINSKI stated that he wanted to go home and DEPUTY BALL recalled that he was on a personal bond with alcohol tether.  DEPUTY BALL asked LESCHINSKI to keep it down at this time.  DEPUTY BALL observed that LESCHINSKI was quiet for about 45 minutes before he became loud again.

88.   That on August 8, 2021, at approximately 9:00 AM, Defendant, DEPUTY BALL called medical to evaluate LESCHINSKI due to his "increasingly erratic behavior."  This behavior included LESCHINSKI running from the rear of his cell and slamming his body into the cell bars repeatedly.

89.     That on August 8, 2021, at approximately 10:00 AM, DEPUTY BALL called medical a second time because LESCHINSKI was "getting louder and louder" and no medical personnel had responded to the floor to see him yet.

90.     Upon information and belief, Defendant, ANGELA LATHAM, RN, during her detoxification rounds, briefly spoke with LESCHINSKI (who was not on detox protocol) from outside the ward on August 8, 2021, at approximately 11:14 AM.

91.     That by the time Nurse LATHAM spoke with LESCHINSKI on August 8, 2021, LESCHINSKI was observed running from the rear of his cell and slamming himself into the cell bars by DEPUTY BALL.  DEPUTY BALL did not call 911 or demand that LESCHINSKI be seen by medical on an urgent basis in spite of the fact that LESCHINSKI was not in detoxification protocol and was in the throes of *delirium tremens*.

92.     It should have been obvious based on medical intake and actual observations combined with the knowledge that LESCHINSKI was not in detoxification protocol that he had a substantial risk of substantial harm requiring urgent medical attention.

93.     It was obvious to a lay person that LESCHINSKI was suffering from *delirium tremens*.

94.     That DEPUTY BALL did not author any *JMS post notes* regarding LESCHINSKI'S behavior on August 8, 2021.

95.     That on August 8, 2021, at approximately 12:05 PM, Sgt. Jackie Thompson and Sgt. Jalil Shabazz escorted LESCHINSKI to the psychiatric floor (4th floor), "per Nurse Latham."

96.     At 12:05 PM on August 8, 2021, JOSEPH LESCHINSKI had been four (4) days without alcohol, had no CIWA administered and received no medication to prevent onset of *delirium tremens*.

97.     That LESCHINSKI was not taken to medical to be evaluated for withdrawal and *delirium tremens* prior to being transferred to the 4th floor.

98.     That on August 8, 2021, at around 3:28 PM, ANGELA LATHAM, RN, documented that LESCHINSKI was in a "psychotic episode", trying to get out of his cell. She stated LESCHINSKI started throwing urine and spitting at staff. A mental health provider was notified at this time. Mr. Leschinski was transferred to the "4th floor" by officers. It was noted that "Dr. Carter" was "aware". "Dr. Carter" is believed to be Defendant, CLARISSE CARTER, NP.

99.     Neither CARTER nor LATHAM contacted 911 to have LESCHINSKI transferred to the hospital in spite of the fact that he was in the throes of *delirium tremens*.

100. That on August 8, 2021, at around 2:10 PM, Deputy Antonio Piva housed LESCHINSKI on the psych floor (floor 4) under the following intervention classification per Nurse Latham: *continuous observation (CO) with gown.* This status indicates that due to the inmate's potential proclivity to self-harm, up to and including suicide, their clothing is confiscated, and he is issued a paper gown to wear; items (personal property, linen, plastic utensils) are also removed from the inmate's cell. Wards where CO status inmates are housed require security rounds to be conducted every 15 minutes.

101. That Defendant, DEPUTY KURT MCLEOD, was working the afternoon shift on August 8, 2021 when LESCHINSKI was transferred to the 4th floor. DEPUTY MCLEOD observed LESCHINSKI pacing back and forth in his cell and talking to himself during his shift. DEPUTY MCLEOD did not contact medical nor call 911 at any time in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

102. That on August 8, 2021, LESCHINSKI was observed climbing cell bars and was incoherent and non-responsive to Defendant, JESSICA CANDACE EBONY DAVIS, LLPC. She did not conduct a mental health intake assessment due to LESCHINSKI'S "unusual presentation." EBONY DAVIS, LLPC did not contact medical nor call 911 at anytime, in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

103.   Delerium Tremens is a medical emergency and should be managed in an inpatient or ICU setting.

104.   That at around 3:30 PM on August 8, "Defendant, TIMOTHY HAYES, NP ordered 5mg haloperidol and 2mg Ativan injections for LESCHINSKI.  The orders for Haloperidol & Ativan are documented as given by Dr. Hayes, recorded by Nurse Latham, and the order was read back to the physician. The medications were administered by Angela Latham, RN.  This order was in spite of the fact that it was obvious that LESCHINSKI was in the throes of *Delirium Tremens* requiring immediate hospitalization.

105.   *Haloperidol* is of no benefit and lowers the seizure threshold which is of great concern with *delirium tremens*.

106.   *Ativan* is too short acting and should only be used in conjunction with a comprehensive detoxification protocol.

107.   The "treatment" provided by TIMOTHY HAYES, NP was harmful and of no medical benefit.

108.   Defendant, TIMOTHY HAYES, NP, recklessly failed to mitigate the risk of *delirium tremens*.

109.   That a "mental health progress note" was added to LESCHINSKI'S jail health record on August 9, 2022 at 12:41 PM by Defendant, JESSICA CANDACE EBONY DAVIS, LLPC.  Mr. Leschinski apparently had a "psychotic

episode," reportedly throwing urine and spitting at staff on August 8, 2022. The report stated they were unable to conduct a MHIA due to the patient's unusual presentation. This mental health provider reported that "it is suspected that patient may be detoxing from unknown substance." JESSICA CANDACE EBONY DAVIS, LLPC called medical to notify nursing staff of the patient's presentation and possible detox, but received no answer.  No referral to the Emergency Room is made and she did not follow up with medical.

110.  Upon information and belief, there is no other documentation of a psych consult in the jail health records.  No CIWA score is taken, even after his "psychotic episode."

111.  That Defendant, DEPUTY JASON THOMAS, was assigned to LESCHINSKI'S floor from the afternoon shift on August 8, 2021 through the midnight shift on August 9, 2021.  DEPUTY THOMAS received a call during his shift from the perimeter deputy informing him that LESCHINSKI was banging on the windows in his cell.  DEPUTY THOMAS entered the ward and observed LESCHINSKI naked, banging on the windows and talking to himself. DEPUTY THOMAS did not contact medical nor call 911 in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

112. That between 0300 hours and 0400 hours on August 9, 2021, DEPUTY THOMAS observed LESCHINSKI awake, and exhibiting this erratic behavior the entire time.  DEPUTY THOMAS did not notify medical personnel at any time in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

113. That Defendant, DEPUTY CARL MILLER-REYNA, was assigned to LESCHINSKI'S floor as a rover on August 8, 2021.  DEPUTY MILLER-REYNA observed LESCHINSKI screaming, shaking the cell bars and talking to the wall in his cell.  DEPUTY MILLER-REYNA did not notify medical personnel at any time in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

114. That Defendant, CORPORAL DANIEL BUDIMIR, observed LESCHINSKI banging on the cell window from his outside perimeter rounds on August 8, 2021, and informed the on-duty sergeant, SERGEANT WATTS.  CORPORAL BUDIMIR stated to investigators that he believed LESCHINSKI was the inmate who was suspected of drinking mop water. CORPORAL BUDIMIR did not contact medical or call 911, in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

115. That Defendant, SERGEANT DONALD WATTS, as the sergeant on-duty, was informed of LESCHINSKI'S behavior during the evening of August

8/early morning hours of August 9. SERGEANT WATTS did not contact medical nor call 911 at any time in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

116. That the WAYNE COUNTY corrections officers did not document LESCHINSKI'S "psychotic episode" and obvious need for medical attention, which occurred on August 8, 2022.

117. That Defendant, DEPUTY KHIDAIR AL-ABID, was assigned to LESCHINSKI'S floor on August 9, 2021, during the afternoon shift. DEPUTY AL-ABID observed LESCHINSKI sitting at a table in his cell, looking out the window and talking to himself, where he remained throughout the shift.

118. That during the afternoon shift on August 9, 2021, the 4th floor was short-staffed and there was only one rover assigned to the floor (there are typically two rovers, one for the north side and one for the south side to assist with rounds).

119. That Defendant, DEPUTY KHIDAIR AL-ABID, missed 16 of his 15-minute rounds on LESCHINSKI during his afternoon shift on August 9. DEPUTY AL-ABID did not contact medical at any time in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

120. That Defendant, DEPUTY BENJAMIN LECK, was assigned to LESCHINSKI'S floor on August 9, 2021, during the afternoon shift. DEPUTY

LECK observed LESCHINSKI during the 2130 hour-round check to be erratic. DEPUTY LECK observed LESCHINSKI at that time, sitting on the table in his cell mumbling to himself. DEPUTY LECK did not contact medical or call 911 at any time, in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

121.   That Defendant, DEPUTY LECK reported to investigators that on the previous night (August 8, 2021), after 2300 hours, the outside perimeter deputy made a page via prep radio regarding LESCHINSKI banging on the cell windows that was later cleared after he was observed for a period by the deputies on the floor. DEPUTY LECK did not contact medical or call 911 at any time, in spite of the fact that LESCHINSKI was not in detoxification protocol and in the throes of *delirium tremens*.

122.   That Defendant, DEPUTY LECK, during the 2200 hour round check on August 9, 2021, observed that LESCHINSKI was still on the table in his cell but had fallen back and was no longer upright.

123. It should have been obvious to each and every one of the CORRECTION OFFICERS that based on medical intake and actual observations combined with the knowledge that LESCHINSKI was not in detoxification protocol that he had a substantial risk of substantial harm requiring urgent medical

attention and was in fact in the throes of a serious medical emergency – *delirium tremens*.

124. That on August 9, 2022 at around 10:14 PM, LESCHINSKI was found unresponsive, laying on the table in his cell. Medical arrived and were unable to find a pulse. CPR was performed until EMS arrived. EMS attempted to resuscitate, and a pulse was found. He was taken by EMS to Detroit Receiving Hospital.

125. That the Detroit Fire Department run narrative reported there was a lengthy extraction out of the jail where LESCHINSKI was found. The report stated, "On scene, Sheriffs state they last saw him alive between 9:30 PM and 10. Patient is reportedly going through heavy drug withdrawals."

126. That LESCHINSKI was admitted to Detroit Receiving Intensive Care Unit with an *impression and plan* reading: "Mr. Leschinski is a 31-year-old male with alcohol use disorder who was brought in by EMS after being found down in jail." His diagnoses included ETOH use disorder.

127. That Detroit Receiving Hospital Records states he was brought in by EMS after being found down in jail. "He was there for alcohol detoxing and per report had been a bit delirious. He was found down about 20 minutes after the previous well-check and had no pulse."

128.   That the Neuro-ICU consult on August 9th at Detroit Receiving reported a history of present illness of a 31-year-old male with alcohol use disorder who presents to the emergency department post cardiac arrest from the jail.  "He was there for alcohol detoxing and per report had been a bit delirious. He was found down about 20 minutes after the previous well-check and had no pulse."  In the emergency room he was found to be hypotensive and bradycardic.  He was severely academic with ph 7.105.

129.   On August 10, 2021, WELLPATH noted his "Problem" as "Alcohol Dependence with withdrawal" which was "Confirmed by" hospital.

130.   That a surgery consult on August 14, 2021 reported Mr. Leschinski had a past medical history significant for alcohol use disorder who was brought in by EMS after being found down in his jail cell.  "Witnesses noticed that the patient was alcohol detoxing and per report had been a bit delirious."

131.   That LESCHINSKI remained on a mechanical vent while his condition deteriorated.  By August 15, 2021, his clinical status required high dosage of pressors and was in multi organ failure requiring CRRT and ventilator support. He was pronounced dead on August 15, 2021 at 6:45 AM at Detroit Receiving Hospital.

132.   That Wayne County Medical Examiner's Office identified LESCHINSKI'S cause of death as alcohol withdrawal syndrome.

133. It was so obvious to Defendants, WAYNE COUNTY CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, that Decedent suffered from *delirium tremens* that they reported to Detroit Receiving Hospital that he was detoxing from alcohol and had been delirious.

134. Although the Plaintiff's Decedent was in obvious need of medical treatment for this serious condition, the named WAYNE COUNTY CORRECTIONS OFFICERS left Decedent inn his cell and continued to totally ignore the Plaintiff's Decedent's need for medical treatment despite it being obvious that the Decedent was going through severe alcohol withdrawals and was in immediate need of medical treatment.

135. Defendants observed the Plaintiff's Decedent exhibiting the obvious and typical signs of an individual going through alcohol withdrawal/*delirium tremens*.

136. Although Defendants observed Plaintiff's Decedent suffering from the obvious and typical signs of *delirium tremens*, they failed to provide the Decedent with appropriate medical care and/or ensure that he was seen by qualified medical personnel and left him suffering.

137. Defendants failed to provide and/or delayed any medical treatment to Plaintiff's Decedent for his serious medical needs, leaving him to die.

138. The flagrant withholding of medical care/ treatment to the Plaintiff's Decedent as he exhibited obvious symptoms of suffering from the *delirium tremens*, was akin to torture and/or cruel and unusual punishment.

**COUNT I**
**DELIBERATE INDIFFERENCE**
**VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 USC § 1983**
**(ALL DEFENDANTS)**

139. Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

140. That the acts or omissions by Defendants was unreasonable and performed knowingly, deliberately, indifferently, intentionally, maliciously, and with gross negligence, callousness, and deliberate indifference to Plaintiff's Decedent's well-being and objectively serious medical needs.

141. That the Defendants individually acted and/or failed to act intentionally and either ignored the serious medical need or recklessly failed to act reasonably to mitigate the risk and the serious medical need.

142. That Plaintiff's Decedent's serious medical condition was one that was so obvious that even a lay person would have easily recognized the necessity for a doctor's immediate attention.

143. That it has been held previously that "…a detainee lying face down, unresponsive and exhibiting symptoms of *delirium tremens* showed a medical need

sufficient for lay people to recognize he needed medical attention." *Bertl v City of Westland, No. 07-2547, 2009 WL 247907, at \*5 (6th Cir., Feb. 2, 2009)*.

144. That this Court has also held that "*delirium tremens*… is a life-threatening condition caused by acute alcohol withdrawal." *Smith v. Cnty of Lenawee, 600 F.3d 686, 688 (6th Cir. 2010)*.

145. According to the National Institutes of Health, *delirium tremens* is "a severe form of alcohol withdrawal that involves sudden and severe mental or nervous system changes." The condition is "serious and may be life threatening" if treatment is not provided. *Kindl v City of Berkley*, 798 F.3d 391 (6th Cir. 2015).

146. That the law was clearly established at the time of this incident and Defendants acted objectively, unreasonably, and are not entitled to qualified immunity.

147. That the aforementioned Defendants adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including failing to train, discipline and/or supervise its employees/agents, which were the motivating force for the individual Defendants' conduct as described herein, such that the same also amounted to a deliberate indifference to Plaintiff's Decedent's well-being and serious medical needs.

148. That the conduct of the Defendants, individually, corporately and as agents of said individual Defendants, deprived Plaintiff's Decedent of his clearly

established rights, privileges, and immunities guaranteed to him under the United States Constitution, specifically those set forth under the Fourth and Fourteenth Amendments, as evidenced by the following particulars:

a. Failing to observe and check on Decedent as Decedent exhibited a serious medical need and was in distress;

b. Consciously exposing Decedent to an excessive risk of serious harm;

c. Failing to request medical care and assistance for Plaintiff's Decedent when it was known that Plaintiff's Decedent was experiencing severe alcohol withdrawal and *delirium tremens*;

d. Failing to secure medical assistance as Plaintiff's Decedent experienced the obvious signs and symptoms of *delirium tremens*;

e. Failing to request medical help during and after being notified that Decedent was suffering from *delirium tremens*;

f. Ignoring requests to provide Plaintiff's Decedent with the needed medical treatment;

g. Failing to request and delaying medical help when it was apparent that Plaintiff's Decedent was unresponsive;

h. Failing to arrange for the jail physician and/or nurse to see and evaluate Plaintiff's Decedent and/or delaying the same when it was known that Plaintiff's Decedent was experiencing severe alcohol withdrawal and *delirium tremens* ;

i. Failing to transfer the Plaintiff's Decedent to the hospital for treatment, monitoring, observation, and supportive measures;

j. Failing to place Decedent on a detox protocol in spite of knowing he was an alcoholic;

k.   Placing Plaintiff's Decedent in a holding cell, and failing to observe and/or monitor him, notwithstanding his known serious medical needs;

l.   Failing to perform necessary jail checks;

m.   Failing to forward "strict return precautions" of a physician to the next custodian;

n.   Delaying necessary medical treatment to the Decedent resulting in horrific pain, suffering and death;

o.   Failing to properly train and supervise the individuals within the aforementioned facility having custodial and/or care giving responsibilities over Decedent, to ensure Decedent's serious medical needs were timely and properly tended to, and to ensure the above breaches/deviations were not committed.

149.   That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

c.   Conscious pain and suffering, physical and emotional;

d.   Humiliation and/or mortification;

e.   Mental anguish;

f.   Economic damages;

g.   Loss of love, society, and companionship;

h.   Loss of gifts, gratuities, and other items of economic value;

i. Parental and spousal guidance, training, and support;

j. Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k. Attorney fees and costs pursuant to 42 USC § 1988;

l. Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT II
## FAILURE TO INTERVENE TO PREVENT VIOLATION OF JOSEPH LESCHINSKI'S FOURTH AND/OR FOURTEENTH AMENDMENT RIGHTS –WRONGFUL DEATH
## DEFENDANTS, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS & WELLPATH MEDICAL STAFF

150. Plaintiff incorporates the above paragraphs as if fully set forth herein.

151. Defendants had a duty to intervene when JOSEPH LESCHINSKI'S rights under the Fourth and/or Fourteenth Amendments to the United States Constitution and 42 USC 1983, were violated by failing to ensure that medical treatment for a serious medical need was obtained.

152. Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, observed or had reason to know

that LESCHINSKI had a serious medical need that required immediate medical treatment and were deliberately indifferent to that need.

153. Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, were deliberately indifferent to LESCHINSKI'S serious medical needs and failed to intervene despite their duty to do so and were each thereby a direct and proximate cause of LESCHINSKI'S death.

154. The foregoing conduct by Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, itself amount to a constitutional violation of LESCHINSKI'S rights under the Fourth, and/or Fourteenth Amendments to United States Constitution.

155. That the above-described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

     a.     Death;

     b.     Reasonable medical, hospital, funeral and burial expenses;

     c.     Conscious pain and suffering, physical and emotional;

     d.     Humiliation and/or mortification;

     e.     Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

j.    Attorney fees and costs pursuant to 42 USC § 1988;

k.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT III
## 42 U.S.C. § 1983 – MONELL LIABILITY- TOWNSHIP OF CANTON, WAYNE COUNTY, WELLPATH LLC & DEFENDANTS IN THEIR OFFICIAL CAPACITIES

156.   Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

157.   At all times relevant, Defendant, TOWNSHIP OF CANTON failed to train, discipline and supervise Defendants, CANTON POLICE OFFICERS, who were responsible for detainee's custody and care, and/or encouraged CANTON POLICE OFFICERS to violate federal and state laws without regard to the

constitutional rights of citizens to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution.

158.   At all times relevant, Defendants, WAYNE COUNTY failed to train, discipline and supervise Defendants, CORRECTIONS OFFICERS, who were responsible for detainee's custody and care, and/or encouraged CORRECTIONS OFFICERS to violate federal and state laws without regard to the constitutional rights of citizens to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution.

159.   At all times relevant, Defendant, WELLPATH, LLC failed to train, discipline and supervise Defendants, WELLPATH MEDICAL STAFF, who were responsible for detainee's custody and care, and/or encouraged WELLPATH MEDICAL STAFF to violate federal and state laws without regard to the constitutional rights of citizens to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution.

160.   At all times relevant, Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC, refused to provide Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, any training, discipline and supervision with regard to the constitutional rights of citizens to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution; refused to provide

supervision and discipline to protect the constitutional rights of citizens, and refused to require Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, to follow policies and procedures and state and federal law relating to the right of an inmate to be provided with  medical care for serious medical needs.

161. At all times relevant, Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC, knew or should have known that the policies, procedures, training supervision and discipline of Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, were inadequate for the tasks that each Defendant was required to perform.

162. At all times relevant, there was a complete failure to train, supervise and discipline Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, and the training, supervision and lack of discipline were so reckless that future violations of the constitutional rights of citizens to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, was certain to occur.

163. At all times relevant, Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC, were on notice and knew that the

failure of training, discipline and/or supervision of Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, with regard to the constitutional rights of citizens to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, was inadequate and would lead to the violation of inmates' constitutional rights.

164. At all times relevant, Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC'S response to this knowledge was so inadequate as to show a complete disregard for whether Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, would violate the constitutional rights of citizens to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution.

165. Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY, SHERIFF RAPHAEL WASHINGTON and WELLPATH, LLC, implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the serious medical needs and cruel and unusual punishment of citizens, and knew or should have known that such treatment would deprive inmates of their constitutional rights.

166. At all times relevant, there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs.

167. At all times relevant, Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC, knew or should have known that there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the Fourth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs.

168. Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC, tolerated Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF's, repeated violations of the Fourth and Fourteenth Amendments to the United States Constitution, which allowed the CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF to continue to engage in this unlawful behavior.

169. Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC, refused to discipline Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF, who violated citizens' constitutional rights to be free from violations of the Fourth

and Fourteenth Amendments to the United States Constitution, failed to fully investigate allegations of misconduct, looked the other way and, thus, tacitly encouraged such behavior.  In doing so, Defendants, TOWNSHIP OF CANTON, WAYNE COUNTY and WELLPATH, LLC, condoned, ratified or encouraged Defendants, CANTON POLICE OFFICERS, CORRECTIONS OFFICERS and WELLPATH MEDICAL STAFF to violate the Fourth and Fourteenth Amendment to the United States Constitution as a matter of policy.

170.   That the conduct of the aforementioned Defendants, individually, corporately and as agents of said individual Defendants, deprived Plaintiff's Decedent of his clearly established rights, privileges, and immunities guaranteed him under the United States Constitution, specifically those set forth under the Fourth and Fourteenth Amendments to same, as evidenced by the following particulars:

a.   Permitting Plaintiff's Decedent and other prisoners to be subject to cruel and unusual punishment, as well as to have them treated in a manner consistent with deliberate indifference to their serious medical needs, in violation of the Fourth and Fourteenth Amendments;

b.   Failing to properly train and supervise the individuals within the aforementioned facility having custodial and/or care giving responsibilities over Decedent to ensure Decedent's serious medical needs, as well as that of other prisoners, were timely and properly tended to, and to ensure the above breaches/deviations were not committed;

c.    Tolerating the conduct of individuals within the aforementioned facility having custodial and/or care when it was apparent that there was a pattern of treatment and/or custom and practice of Decedent and other inmates in a manner consistent with deliberate indifference to his serious medical needs and in violation of his Fourth and Fourteenth Amendment rights;

d.    Failing to discipline the individuals within the aforementioned facility having custodial and/or care when it was apparent that they were treating Decedent and other inmates in a manner consistent with deliberate indifference to his serious medical needs and in violation of his Fourth and Fourteenth Amendment rights.

e.    Failing to have an appropriate detoxification protocol/policy and/or having a custom and practice of the detoxification protocol not being implemented.

171.   That the above-described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

      i.     Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

      j.     Attorney fees and costs pursuant to 42 USC § 1988;

      k.     Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT IV
## STATE LAW CLAIMS OF GROSS NEGLIGENCE, AND/OR WANTON AND WILLFUL MISCONDUCT
## (ALL DEFENDANTS)

172. Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

173. That Defendants' had knowledge of each and every factual allegation set forth above.

174. That in taking custody of Plaintiff's Decedent, Defendants undertook and owed a duty to Decedent to make reasonable efforts to care for him in a reasonable and prudent manner, to exercise due care and caution, and in such operation as the rules of the common law require, and in accordance with the customs, policies and procedures.

175. That Defendants breached each and every duty owed to Plaintiff's Decedent.

176. That notwithstanding the aforementioned duties, the aforementioned Defendants took into custody, incarcerated, and monitored Decedent in an extremely careless, grossly negligent, reckless, and wanton and willful manner without concern whatsoever for his safety and welfare, and failed to tend to Decedent's serious medical needs, including, but not limited to, the following particulars by way of illustration and not limitation:

a. Failing to observe and check on Decedent;

b. Failing to request medical care and assistance for Decedent;

c. Failing to secure medical assistance while Decedent was obviously suffering from *delirium tremens*;

d. Failing to request medical help well before the death of the Decedent;

e. Failing to arrange for the jail physician to see and evaluate Decedent in a timely manner when Decedent was experiencing *delirium tremens*;

f. Failing to transfer the Decedent to the hospital for treatment, workup, monitoring, observation, and supportive measures as described herein;

g. Placing Decedent in a holding cell to suffer notwithstanding his known serious medical needs;

h. Failing to monitor the Decedent who was known to be suffering;

    i.    Failing to request and arrange for timely medical attention when it was known Decedent had an immediate serious medical need;

    j.    Failing to maintain observation and/or supervision of Decedent;

    k.    Failing to properly train and supervise the individuals within the aforementioned facility having custodial and/or care giving responsibilities over Decedent to ensure Decedent's serious medical needs were timely and properly tended to, and to ensure the above breaches/ deviations were not committed.

177. That the above-described actions and/or inactions violated MCL 691.1407 in that they amounted to gross negligence, specifically conduct so reckless as to demonstrate a substantial disregard for whether an injury resulted to the Decedent.

178. That Defendants are not entitled to governmental immunity based upon their actions.

179. That the above-described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

    a.    Death;

    b.    Reasonable medical, hospital, funeral and burial expenses;

    c.    Conscious pain and suffering, physical and emotional;

    d.    Humiliation and/or mortification;

    e.    Mental anguish;

f.     Economic damages;

g.     Loss of love, society, and companionship;

h.     Loss of gifts, gratuities, and other items of economic value;

i.     Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

j.     Attorney fees and costs pursuant to 42 USC § 1988;

k.     Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

**COUNT V**
**STATE LAW CLAIMS OF MEDICAL MALPRACTICE/**
**NEGLIGENCE/GROSS NEGLIGENCE**
**WELLPATH, LLC**

180.   Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

181.   Defendant, WELLPATH, LLC, was required to provide the recognized standard of practice or care as that of the skill and care ordinarily possessed and exercised by a health care facility in the same or similar localities. WELLPATH, LLC breached the applicable standard of care by failing to timely and appropriately do all of the following:

a.   Ensure a psychiatrist is on staff and available at all times at this detention facility which houses inmates who are clinically assessed as needing residential mental health services, in addition to psychotropic medications.

b.   Enact protocols for the assessment and treatment of individuals with withdrawal symptoms or a history of substance abuse.

c.   Perform and appreciate a thorough history and mental health examination when the history provided is that the examinee is going through the DTs for alcohol withdrawal;

d.   Employ or contract with medical professionals who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities;

e.   Adequately supervise, direct, monitor and control these providers;

f.   Draft, promulgate, adopt and/or enforce appropriate rules, regulations, policies and procedures which would enable and engender its healthcare providers to render appropriate and timely treatment to patients looking to it for said treatment, including Decedent, and ensure the adequacy of the experience level and expertise of these providers;

g.   Enact protocols for managing inmates under the influence of or undergoing withdrawal from alcohol, sedatives, opioids, and/or other substances.

h.   Enact protocols for intoxication and withdrawal that are approved by the responsible physician annually and are consistent with nationally accepted treatment guidelines.

i.   Ensure individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using approved protocols as clinically indicated until symptoms have resolved.

j.   Ensure Individuals being monitored are housed in a safe location that allows for effective monitoring.

k.   Ensure that if the findings from patient monitoring meet the national guidelines to begin prescription medications, *medically supervised withdrawal* is implemented.

l.   Ensure medically supervised withdrawal is done under provider supervision.

m.   Ensure inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility.

n.   Ensure the facility has a policy that addresses the management of inmates on medication assisted treatment (MAT).

o.   Ensure inmates entering the facility on MAT have their medication continued, or a plan for medically supervised withdrawal is initiated.

p.   Ensure disorders associated with alcohol and other drugs (e.g., HIV, liver disease) are recognized and treated.

q.   Ensure all aspects of the standard are addressed by written policy and defined procedures.

r.   Other acts of professional negligence yet to be determined.

182. At all times relevant to the care and treatment of Decedent, Defendants, WELLPATH, LLC, failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent.

183. Defendant, WELLPATH, LLC'S, breaches in the standard of care as set forth above was the proximate cause of Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

{01552689.DOCX}                                       51

c.  Conscious pain and suffering, physical and emotional;

d.  Humiliation and/or mortification;

e.  Mental anguish;

f.  Economic damages;

g.  Loss of love, society, and companionship;

h.  Loss of gifts, gratuities, and other items of economic value;

i.  Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

j.  Attorney fees and costs pursuant to 42 USC § 1988;

k.  Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

184.  That as a further consequence of the negligence described above, Plaintiff's decedent, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Michigan Wrongful Death Act, MCL 600.2922.

185.  Defendant, WELLPATH, LLC, through his agents and employees, including but not limited to, JOHN DOE PSYCHIATRIST, TIMOTHY HAYES, NP, CLARISSE CARTER, NP, JESSICA CANDACE-EBONY DAVIS, LLPC,

{01552689.DOCX}                                    52

LILIAN EKECHUKWU, RN, ANGELA R. LATHAM, RN & and all unidentified WELLPATH, LLC NURSING STAFF, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

## COUNT VI
## STATE LAW CLAIMS OF MEDICAL MALPRACTICE/ NEGLIGENCE/GROSS NEGLIGENCE
## JOHN DOE PSYCHIATRIST

186.   Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

187.   Defendant, JOHN DOE PSYCHIATRIST, was required to provide the recognized standard of practice or care within his specialty and was required to render care as a reasonable and prudent physician board certified in psychiatry of average training, experience and education under the same or similar clinical circumstances.  JOHN DOE PSYCHIATRIST breached the applicable standard of care by failing to timely and appropriately do all of the following:

    a.    Obtain and appreciate a full, thorough and complete history for the patient in order to create an appropriate and safe treatment plan for the patient;

b.  Perform a thorough mental health / psychiatric examination on the patient that has signs of chronic alcohol dependence when the history provided is that the examinee admits to consuming an average of "six shots of vodka daily for over a year" and who was arrested for DUI at 10:24 AM with BAC of .35 and who is coherent;

c.  Timely and appropriately recognize that the Decedent was at high risk for developing *delirium tremens* and alcohol withdrawal and that such conditions can be life-threatening if not properly managed;

d.  Timely provide appropriate care, monitoring, and treatment for a patient such as the Decedent, who was suffering from *psychotic episodes*, *delirium tremens,* and *alcohol withdrawal*;

e.  Timely and appropriately recognize that the Decedent required immediate, emergent evaluation and treatment;

f.  Perform timely and accurate comprehensive assessments and examination of the Decedent to assess his risk for *delirium tremens* and alcohol withdrawal and appreciate a thorough history and mental health examination when the history provided is that the examinee admits to consuming an average of "six shots of vodka daily for over a year."

g.  Appropriately diagnose *delirium tremens* and severe alcohol withdrawal and make a referral for medical treatment and/or medically assisted withdrawal of this life threatening medical condition;

h.  Ensure that the Decedent underwent medical treatment for this urgent and life-threatening medical condition;

i.  Keep apprised of the Decedent's status and changes in his condition after observing that he was experiencing symptoms associated with *delirium tremens* and alcohol withdrawal;

j.  Timely and appropriately consult with your supervising Licensed Professional Counsel regarding the results of your comprehensive assessments and evaluations of the Decedent so as to obtain proper medical treatment for him;

k.   Properly supervise the Registered Nurses and Nurse Practitioners working under her license so that said Registered Nurses could perform and appreciate a thorough history and examination when the history provided is that the examinee has symptoms of alcohol withdrawal;

l.   Properly supervise Registered Nurses and Nurse Practitioners working under his so license so that said Registered Nurses appropriately understand the symptoms of alcohol withdrawal and make a referral for medical treatment and/or medical assistance of this life threatening medical condition;

m.   Properly supervise Registered Nurses and Nurse Practitioners working under his license so that it was ensured that said Registered Nurses administering Haloperidol and Ativan followed up daily with vital signs and documented those vital signs;

n.   Properly supervise Registered Nurses and Nurse Practitioners working under his license so that antipsychotic medications and antianxiety medications were not provided without written order;

o.   Properly supervise Registered Nurses and Nurse Practitioners working under him so that said Registered Nurse ensured that the Decedent underwent medical treatment for this urgent and life threatening medical condition;

p.   Personally evaluate the Decedent when it was learned that he was having a psychotic episode with a history of alcohol abuse;

q.   Perform differential diagnoses to rule out *delirium tremens* when presented with a patient who's history shows he was arrested with .35 BAC and was coherent and 4 days later exhibited psychotic behaviors of throwing urine and spitting on staff;

r.   Follow facility protocols for managing inmates under the influence of or undergoing withdrawal from alcohol, sedatives, opioids, and/or other substances;

s. Follow facility protocols for intoxication and withdrawal that are approved by the responsible physician annually and are consistent with nationally accepted treatment guidelines;

t. Ensure individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using approved protocols as clinically indicated until symptoms have resolved;

u. Ensure Individuals being monitored are housed in a safe location that allows for effective monitoring;

v. Ensure that if the findings from patient monitoring meet the national guidelines to begin prescription medications, *medically supervised withdrawal* is implemented;

w. Ensure medically supervised withdrawal is done under provider supervision;

x. Ensure inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility;

y. Follow the facility policy that addresses the management of inmates on medication assisted treatment (MAT);

z. Ensure inmates entering the facility on MAT have their medication continued, or a plan for medically supervised withdrawal is initiated;

aa. Ensure disorders associated with alcohol and other drugs (e.g., HIV, liver disease) are recognized and treated;

bb. Follow all aspects of the standard addressed by written policy and defined procedures;

cc. Other acts of professional negligence yet to be determined.

188. At all times relevant to the care and treatment of Decedent, Defendant, JOHN DOE PSYCHIATRIST, and persons under his supervision,

failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent.

189. Defendant, JOHN DOE PSYCHIATRIST'S, breaches in the standard of care as set forth above was the proximate cause of Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

    a.    Death;

    b.    Reasonable medical, hospital, funeral and burial expenses;

    c.    Conscious pain and suffering, physical and emotional;

    d.    Humiliation and/or mortification;

    e.    Mental anguish;

    f.    Economic damages;

    g.    Loss of love, society, and companionship;

    h.    Loss of gifts, gratuities, and other items of economic value;

    i.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

    j.    Attorney fees and costs pursuant to 42 USC § 1988;

    k.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

190. That as a further consequence of the negligence described above, Plaintiff's decedent, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care

{01552689.DOCX}

were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Michigan Wrongful Death Act, MCL 600.2922.

191. Defendant, WELLPATH, LLC, through his agents and employees, including but not limited to, JOHN DOE PSYCHIATRIST, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

**COUNT VII**
**STATE LAW CLAIMS OF MEDICAL MALPRACTICE/**
**NEGLIGENCE/GROSS NEGLIGENCE**
**TIMOTHY HAYES, NP**

192. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

193. Defendant, TIMOTHY HAYES, NP, was required to provide the recognized standard of practice or care within his specialty and was to provide care in conformance with the skill and care ordinarily possessed and exercised by

practitioners of his profession in the same or similar location. TIMOTHY HAYES, NP breached the applicable standard of care by failing to timely and appropriately do all of the following:

a. Properly supervise the Registered Nurses working under his license so that said Registered Nurses could perform and appreciate a thorough history and examination when the history provided is that the examinee has symptoms of alcohol withdrawal.

b. Properly supervise Registered Nurses working under his so license so that said Registered Nurses appropriately understand the symptoms of alcohol withdrawal and make a referral for medical treatment and/or medical assistance of this life threatening medical condition;

c. Properly supervise Registered Nurses working under his license so that it was ensured that said Registered Nurses administering Haloperidol and Ativan followed up daily with vital signs and documented those vital signs.

d. Properly supervise Registered Nurses working under his license so that antipsychotic medications and antianxiety medications were not provided without written order.

e. Properly supervise Registered Nurses working under him so that said Registered Nurse ensured that the Decedent underwent medical treatment for this urgent and life threatening medical condition;

f. Personally evaluate the Decedent when it was learned that he was having a psychotic episode with a history of alcohol abuse.

g. Perform differential diagnoses to rule out *delirium tremens* when presented with a patient who's history shows he was arrested with .35 BAC and was coherent and 4 days later exhibited psychotic behaviors of throwing urine and spitting on staff.

h.  Refrain from prescribing Haloperidol which is contraindicated for *delirium tremens* as it provides no benefit and lowers the seizure threshold.

i.  Refrain from prescribing Ativan alone which can only be prescribed in treating *delirium tremens* in conjunction with other medications as it is too short acting and must be administered within a program to include CIWA monitoring every 4-6 hours.

j.  Follow facility protocols for managing inmates under the influence of or undergoing withdrawal from alcohol, sedatives, opioids, and/or other substances.

k.  Follow facility protocols for intoxication and withdrawal that are approved by the responsible physician annually and are consistent with nationally accepted treatment guidelines.

l.  Ensure individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using approved protocols as clinically indicated until symptoms have resolved.

m.  Ensure Individuals being monitored are housed in a safe location that allows for effective monitoring.

n.  Ensure that if the findings from patient monitoring meet the national guidelines to begin prescription medications, *medically supervised withdrawal* is implemented.

o.  Ensure medically supervised withdrawal is done under provider supervision.

p.  Ensure inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility.

q.  Follow the facility policy that addresses the management of inmates on medication assisted treatment (MAT).

r.   Ensure inmates entering the facility on MAT have their medication continued, or a plan for medically supervised withdrawal is initiated.

s.   Ensure disorders associated with alcohol and other drugs (e.g., HIV, liver disease) are recognized and treated.

t.   Follow all aspects of the standard addressed by written policy and defined procedures.

u.   Other acts of professional negligence yet to be determined

194.   At all times relevant to the care and treatment of Decedent, Defendant, TIMOTHY HAYES, NP, and persons under his supervision, failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent.

195.   Defendant, TIMOTHY HAYES, NP'S, breaches in the standard of care as set forth above was the proximate cause of Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

c.   Conscious pain and suffering, physical and emotional;

d.   Humiliation and/or mortification;

e.   Mental anguish;

f.   Economic damages;

g.   Loss of love, society, and companionship;

{01552689.DOCX}

61

    h.     Loss of gifts, gratuities, and other items of economic value;

    i.     Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

    j.     Attorney fees and costs pursuant to 42 USC § 1988;

    k.     Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

196.   That as a further consequence of the negligence described above, Plaintiff's decedent, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Michigan Wrongful Death Act, MCL 600.2922.

197.   Defendant, WELLPATH, LLC, through his agents and employees, including but not limited to, TIMOTHY HAYES, NP, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

**COUNT VIII**
**STATE LAW CLAIMS OF MEDICAL MALPRACTICE/**
**NEGLIGENCE/GROSS NEGLIGENCE**
**CLARISSE CARTER, NP**

198. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

199. Defendant, CLARISSE CARTER, NP, was required to provide the recognized standard of practice or care within her specialty and was to provide care in conformance with the skill and care ordinarily possessed and exercised by practitioners of her profession in the same or similar location. CLARISSE CARTER, NP breached the applicable standard of care by failing to timely and appropriately do all of the following:

    a. Properly supervise the Registered Nurses working under her license so that said Registered Nurses could perform and appreciate a thorough history and examination when the history provided is that the examinee has symptoms of alcohol withdrawal.

    b. Properly supervise Registered Nurses working under her so license so that said Registered Nurses appropriately understand the symptoms of alcohol withdrawal and make a referral for medical treatment and/or medical assistance of this life threatening medical condition;

c. Properly supervise Registered Nurses working under her license so that it was ensured that said Registered Nurses administering Haloperidol and Ativan followed up daily with vital signs and documented those vital signs.

d. Properly supervise Registered Nurses working under her license so that antipsychotic medications and antianxiety medications were not provided without written order.

e. Properly supervise Registered Nurses working under her so that said Registered Nurse ensured that the Decedent underwent medical treatment for this urgent and life threatening medical condition;

f. Personally evaluate the Decedent when it was learned that he was having a psychotic episode with a history of alcohol abuse.

g. Perform differential diagnoses to rule out *delirium tremens* when presented with a patient whose history shows he was arrested with .35 BAC and was coherent and 4 days later exhibited psychotic behaviors of throwing urine and spitting on staff.

h. Follow facility protocols for managing inmates under the influence of or undergoing withdrawal from alcohol, sedatives, opioids, and/or other substances.

i. Follow facility protocols for intoxication and withdrawal that are approved by the responsible physician annually and are consistent with nationally accepted treatment guidelines.

j. Ensure individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using approved protocols as clinically indicated until symptoms have resolved.

k. Ensure Individuals being monitored are housed in a safe location that allows for effective monitoring.

l. Ensure that if the findings from patient monitoring meet the national guidelines to begin prescription medications, *medically supervised withdrawal* is implemented.

m.   Ensure medically supervised withdrawal is done under provider supervision.

n.   Ensure inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility.

o.   Follow the facility policy that addresses the management of inmates on medication assisted treatment (MAT).

p.   Ensure inmates entering the facility on MAT have their medication continued, or a plan for medically supervised withdrawal is initiated.

q.   Ensure disorders associated with alcohol and other drugs (e.g., HIV, liver disease) are recognized and treated.

r.   Follow all aspects of the standard addressed by written policy and defined procedures.

s.   Other acts of professional negligence yet to be determined.

200.   At all times relevant to the care and treatment of Decedent, Defendant, CLARISSE CARTER, NP, and persons under his supervision, failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent.

201.   Defendant, CLARISSE CARTER, NP'S, breaches in the standard of care as set forth above was the proximate cause of Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

  c.  Conscious pain and suffering, physical and emotional;

  d.  Humiliation and/or mortification;

  e.  Mental anguish;

  f.  Economic damages;

  g.  Loss of love, society, and companionship;

  h.  Loss of gifts, gratuities, and other items of economic value;

  i.  Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

  j.  Attorney fees and costs pursuant to 42 USC § 1988;

  k.  Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

202. That as a further consequence of the negligence described above, Plaintiff's decedent, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Michigan Wrongful Death Act, MCL 600.2922.

203. Defendant, WELLPATH, LLC, through his agents and employees, including but not limited to, CLARISSE CARTER, NP, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or

{01552689.DOCX}

pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

**COUNT IX**
**STATE LAW CLAIMS OF MEDICAL MALPRACTICE/**
**NEGLIGENCE/GROSS NEGLIGENCE**
**JESSICA CANDACE-EBONY DAVIS, LLPC**

204. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

205. Defendant, JESSICA CANDACE-EBONY DAVIS, LLPC, was required to provide the recognized standard of practice or care within her specialty and was to provide care in conformance with the skill and care ordinarily possessed and exercised by practitioners of her profession in the same or similar location. JESSICA CANDACE-EBONY DAVIS, LLPC breached the applicable standard of care by failing to timely and appropriately do all of the following:

    a.    Timely and appropriately recognize that the Decedent was at high risk for developing *delirium tremens* and alcohol withdrawal and that such conditions can be life-threatening if not properly managed by a physician or psychiatrist, and accurately document same;

    b.    Timely provide appropriate care, monitoring, and treatment for a patient such as the Decedent, who was suffering from *psychotic episodes*, *delirium tremens,* and *alcohol withdrawal*

after recognizing his signs and symptoms are associated with high risk conditions;

c.    Timely and appropriately recognize that the Decedent required immediate evaluation and treatment by a physician, mid-level practitioner, or psychiatrist and arrange for said evaluation and appropriately implement treatment interventions;

d.    Perform timely and accurate comprehensive assessments and examination of the Decedent to assess his risk for *delirium tremens* and alcohol withdrawal and appreciate a thorough history and mental health examination when the history provided is that the examinee admits to consuming an average of "six shots of vodka daily for over a year."

e.    Appropriately diagnose *delirium tremens* and severe alcohol withdrawal and make a referral for medical treatment and/or medically assisted withdrawal of this life threatening medical condition;

f.    Ensure that the Decedent underwent medical treatment for this urgent and life-threatening medical condition;

g.    Keep apprised of the Decedent's status and changes in his condition after observing that he was experiencing symptoms associated with *delirium tremens* and alcohol withdrawal;

h.    Timely and appropriately consult with your supervising Licensed Professional Counselor regarding the results of your comprehensive assessments and evaluations of the Decedent so as to obtain proper medical treatment for him;

i.    Follow facility protocols for managing inmates under the influence of or undergoing withdrawal from alcohol, sedatives, opioids, and/or other substances.

j.    Follow facility protocols for intoxication and withdrawal that are approved by the responsible physician annually and are consistent with nationally accepted treatment guidelines.

k.    Ensure individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using

{01552689.DOCX}

68

approved protocols as clinically indicated until symptoms have resolved.

l. Ensure Individuals being monitored are housed in a safe location that allows for effective monitoring.

m. Ensure that if the findings from patient monitoring meet the national guidelines to begin prescription medications, *medically supervised withdrawal* is implemented.

n. Ensure medically supervised withdrawal is done under provider supervision.

o. Ensure inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility.

p. Follow the facility policy that addresses the management of inmates on medication assisted treatment (MAT).

q. Ensure inmates entering the facility on MAT have their medication continued, or a plan for medically supervised withdrawal is initiated.

r. Ensure disorders associated with alcohol and other drugs (e.g., HIV, liver disease) are recognized and treated.

s. Follow all aspects of the standard addressed by written policy and defined procedures.

t. Other acts of professional negligence yet to be determined.

206. At all times relevant to the care and treatment of Decedent, Defendant, JESSICA CANDACE-EBONY DAVIS, LLPC, and persons under his supervision, failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent.

207. Defendant, JESSICA CANDACE-EBONY DAVIS, LLPC'S, breaches in the standard of care as set forth above was the proximate cause of Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

a. Death;

b. Reasonable medical, hospital, funeral and burial expenses;

c. Conscious pain and suffering, physical and emotional;

d. Humiliation and/or mortification;

e. Mental anguish;

f. Economic damages;

g. Loss of love, society, and companionship;

h. Loss of gifts, gratuities, and other items of economic value;

i. Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

j. Attorney fees and costs pursuant to 42 USC § 1988;

k. Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

208. That as a further consequence of the negligence described above, Plaintiff's decedent, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and

{01552689.DOCX}                                    70

burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Michigan Wrongful Death Act, MCL 600.2922.

209. Defendant, WELLPATH, LLC, through his agents and employees, including but not limited to, JESSICA CANDACE-EBONY DAVIS, LLPC, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

**COUNT X**
**STATE LAW CLAIMS OF MEDICAL MALPRACTICE/**
**NEGLIGENCE/GROSS NEGLIGENCE**
**LILIAN EKECHUKWU, RN, ANGELA R. LATHAM, RN & WELLPATH,**
**LLC'S NURSING STAFF**

210. Plaintiff hereby restates and reincorporates each and every allegation set forth in the previous paragraphs of this Complaint as if fully set forth herein.

211. Defendants, LILIAN EKECHUKWU, RN, ANGELA R. LATHAM, RN & and all unidentified WELLPATH, LLC NURSING STAFF, were required to provide the recognized standard of practice or care within their specialty and were to provide care in conformance with the skill and care ordinarily possessed

{01552689.DOCX} 71

and exercised by correctional registered nurses in the same or similar location. LILIAN EKECHUKWU, RN, ANGELA R. LATHAM, RN & and all unidentified WELLPATH, LLC NURSING STAFF breached the applicable standard of care by failing to timely and appropriately do all of the following:

a. Timely and appropriately conduct in-processing in accordance with the National Commission on Correctional Health Care (NCCHC) which mandates in-processing is to take place as soon as possible.

b. Timely and appropriately access and review medical records and history available from the arresting police department to obtain a thorough and accurate history, including but not limited to police escorted emergency department visits.

c. Assess the patient with a Chemical Influence Withdrawal Assessment tool (CIWA) when the patient is identified as a chronic alcohol user stating that he consumed an average of "six shots of vodka daily for over a year."

d. Immediately Refer the patient for evaluation by a medical doctor either on premise or to an outside clinic when the patient is identified as a chronic alcohol user stating that he consumed an average of "six shots of vodka daily for over a year."

e. Hold the patient for further observation when the patient is identified as a chronic alcohol user stating that he consumed an average of "six shots of vodka daily for over a year."

f. Follow protocols for the assessment and treatment of individuals with withdrawal symptoms or a history of substance abuse.

g. Timely and appropriately document the care of a patient having a "psychotic episode," including attempts to redirect the patient and attempts to ascertain the cause of the psychotic episode (ie: head injury? Drug injection? Review of in processing information?).

h.  Physically assess the patient before and after the Haloperidol & Ativan are given.

i.  When the Haloperidol & Ativan were ordered, timely and appropriately document the patient's condition, threat posed, the reason for medication, other treatment modalities attempted, and treatment plan goals for less restrictive alternatives as soon as possible, in accordance with NCCHC guidelines.

j.  Timely and Appropriately conduct follow-up care when medication is forced.

k.  Timely and appropriately document following the forced medication at least once within the first 15 minutes, then every 30 minutes until transfer to an inpatient setting or the patient no longer requires monitoring.

l.  Timely and appropriately document the effect the medication had on the patient's condition post medication.

m.  Timely and appropriately document the order for medication in a manner that is clear as to their origin (ie: telephone order), the medications, dosage, route, frequency, etc., and provide detailed documentation as to the nurse's assessment of the patient and what information was conveyed to the ordering physician.

n.  Timely and appropriately assess the patient's vital signs when the patient previously identified himself as a chronic alcohol user.

o.  Conduct timely nursing follow-ups after a patient's is reported to have a "psychotic event" and the injection of emergency medications.

p.  Timely and appropriately assess and document the patient's condition post medication.

q.  Timely and appropriately document clinical encounters or significant events such as the patient being found unresponsive or the suspicion that the patient was suffering from acute withdrawal, on an "as soon as possible" basis.

r.   Immediately communicate to a clinician when there is a suspicion the patient is suffering withdrawal symptoms and follow up until the condition is addressed by a clinician.

s.   Comply with National Correctional Health Care (NCCHC) guidelines;

t.   Other acts of professional negligence yet to be determined.

212.   At all times relevant to the care and treatment of Decedent, Defendants, LILIAN EKECHUKWU, RN, ANGELA R. LATHAM, RN and all unidentified WELLPATH, LLC NURSING STAFF, and persons under their supervision, failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent.

213.   Defendants, LILIAN EKECHUKWU, RN, ANGELA R. LATHAM, RN & and all unidentified WELLPATH, LLC NURSING STAFF, breaches in the standard of care as set forth above was the proximate cause of Decedent's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

c.   Conscious pain and suffering, physical and emotional;

d.   Humiliation and/or mortification;

e.   Mental anguish;

f.   Economic damages;

g.      Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

j.      Attorney fees and costs pursuant to 42 USC § 1988;

k.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, *et seq*.

214.    That as a further consequence of the negligence described above, Plaintiff's decedent, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Michigan Wrongful Death Act, MCL 600.2922.

215.    Defendant, WELLPATH, LLC, through his agents and employees, including but not limited to, LILIAN EKECHUKWU, RN, ANGELA R. LATHAM, RN & and all unidentified WELLPATH, LLC NURSING STAFF, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

Respectfully submitted,

**Fieger, Fieger, Kenney & Harrington, P.C.**

*s/ Kevin C. Riddle*_____
GEOFFREY N. FIEGER (P30441)
KEVIN C. RIDDLE (P57435)
Attorneys for Plaintiff
19390 W. Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555 / (248) 355-5148 - fax
k.riddle@fiegerlaw.com
P57435

Dated:  January 3, 2024

{01552689.DOCX}                          76

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

REBECCA LESCHINSKI,
Personal Representative of the Estate of
JOSEPH LESCHINSKI, Deceased,

    Plaintiff,

v.

TOWNSHIP OF CANTON, OFFICER
BRANDON HAYFORD, OFFICER ALEXIS
DIVETTA, WAYNE COUNTY, DEPUTY
CHRISTOPHER PAULSEN, CORPORAL ERIC
ROBINSON, DEPUTY TAMIKO BALL,
DEPUTY KURT MCLEOD, DEPUTY JASON
THOMAS, DEPUTY CARL MILLER-REYNA,
CORPORAL DANIEL BUDIMIR, SERGEANT
DONALD WATTS, DEPUTY KHIDAIR AL-
ABID, DEPUTY BENJAMIN LECK,
WELLPATH, LLC, JOHN DOE PSYCHIATRIST,
TIMOTHY HAYES, NP, CLARISSE CARTER,
NP, JESSICA CANDACE-EBONY DAVIS,
LLPC, LILIAN EKECHUKWU, RN, ANGELA R.
LATHAM, RN,

    Defendants.

Case No. 2:24-cv-10012

HON.

---

JAMES J. HARRINGTON, IV (P65351)
KEVIN C. RIDDLE (P57435)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West 10 Mile Road
Southfield, MI  48075
(248) 355-5555 / (248) 355-5148 - fax
k.riddle@fiegerlaw.com

**<ins>PLAINTIFF'S DEMAND FOR TRIAL BY JURY</ins>**

{01552689.DOCX}                     77

NOW COMES Plaintiff, REBECCA LESCHINSKI, Personal Representative of the Estate of JOSEPH LESCHINSKI, DECEASED, by and through her attorneys, Fieger, Fieger, Kenney & Harrington, P.C., and hereby affirm her request for trial by jury in this matter.

Respectfully submitted,

**Fieger, Fieger, Kenney & Harrington, P.C.**

_s/ Kevin C. Riddle_____
GEOFFREY N. FIEGER (P30441)
KEVIN C. RIDDLE (P57435)
Attorneys for Plaintiff
19390 W. Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555 / (248) 355-5148 (fax)
k.riddle@fiegerlaw.com
P57435

Dated:  January 3, 2024